**United States District Court
for the District Of New Jersey**

| | |
|---|---|
| MAXLITE, INC.,<br><br>                    Plaintiff,<br>v.<br><br>M&C LIGHTING LTD F/N/A MODERN AND CLASSIC LIGHTING, LTD., D/B/A EXCEEDLITE, DENNIS SHIA, AND JOHN DOES 1-10, and XYZ CORP. 1-10,<br><br>                    Defendants. | Civil No.: 12-4072 (KSH)<br><br><br><br><br><br><br><br>**OPINION** |

**Katharine S. Hayden, U.S.D.J.**

This matter comes before the Court by way of a Fed. R. Civ. P. 55(c) motion [D.E. 57], filed by defendants M&C Lighting Ltd. and Dennis Shia, to vacate the Clerk of the Court's January 7, 2013 entry of default. The motion will be granted and the default will be set aside.

**I.    Background**

    A)    <u>The Complaint</u>

In July 2012, New Jersey corporate plaintiff MaxLite, Inc., filed a complaint [D.E. 1] against defendants for, among other things, breach of contract. MaxLite demanded both compensatory and injunctive relief.

According to the complaint, M&C and MaxLite entered into a vendor agreement pursuant to which M&C would manufacture certain lighting products for MaxLite. (Compl. ¶¶ 22–25.) The vendor agreement contained various provisions that imposed limits on M&C's

conduct under the contract, including: a prohibition on selling exclusive "MaxLite Projects" to entities other than MaxLite, an understanding that MaxLite would retain control of relevant design/manufacturing know-how and intellectual property, a confidentiality agreement, a restriction on M&C's use of its relationship with MaxLite in M&C's self-promotion, and a concession by M&C to refrain from soliciting MaxLite employees. (Compl. ¶¶ 25–32.) As part of the relationship between the companies (which predated the vendor agreement), M&C was privy to the specifications of MaxLite's lamp products and technical accessories, which differed from those M&C had produced in the past. (Compl. ¶¶ 15–16, 24.) M&C also had occasional access to MaxLite's internal operations, business practices, and personnel, as well as "the identities of MaxLite's customers, pricing, and other information as a result of directly fulfilling orders placed with MaxLite." (Compl. ¶¶ 17–18.)

According to MaxLite, the relationship began to show signs of strain in the late 2000s. Although MaxLite's business was doing well, M&C experienced "significant financial problems" stemming from economic tumult and tightened purchasing budgets among its clients. As a result, M&C's fulfillment of MaxLite's orders suffered occasional delays, threatening to "cost MaxLite a substantial amount of money." (Compl. ¶¶ 39–40.) Having already invested significant time, cash, and resources into M&C's operations, MaxLite believed switching vendors to be an unacceptable course of action; instead, it assisted M&C financially, through both prepayment of invoices and cash advances. (Compl. ¶¶ 41–43.) But as M&C's problems persisted, MaxLite was eventually forced to "locate other manufacturers and reduce its overall dependence on M&C." (Compl. ¶ 50.)

And then: during its due diligence on other suppliers, MaxLite discovered "the truth about M&C." (Compl. ¶ 51.) According to MaxLite, it learned that another company, Bright

2

Lighting, was "actually producing the orders on behalf of M&C." (Compl. ¶ 51.) And the factories MaxLite had seen during its trips to China were not M&C's, but were instead part of a "carefully constructed . . . charade." (Compl. ¶ 52.) "Despite all the trust and business MaxLite had given M&C," MaxLite contended, "M&C had lied and defrauded MaxLite from the outset of the relationship." (Compl. ¶ 52.)

M&C's duplicity—its "nefarious plot" (Compl. ¶ 55)—allegedly extended to violations of the vendor agreement. For instance, M&C purportedly engaged in back-channel negotiations (through defendant Shia) in an attempt to woo a MaxLite employee, Brian Park. (Compl. ¶¶ 60–62.) And M&C allegedly created a new corporation, Exceedlite, through which it offered "MaxLite quality at a much lower price," and whose products were "simply rebadged MaxLite products." (Compl. ¶¶ 63–66.)

      B)      <u>Preliminary Injunction, Attorney Withdrawal, and M&C's Disappearance</u>

In August 2012, before defendants answered the complaint, MaxLite filed a motion for a preliminary injunction [D.E. 13], seeking to restrain defendants' allegedly damaging misconduct. The motion requested injunctive relief that was substantially the same as what was demanded in the complaint. (*Compare* Pl.'s Prelim. Inj. Proposed Order 1–2 [D.E. 13-1], *with* Compl. 30–31.). On September 21, 2012, defendants answered the complaint, with M&C asserting counterclaims against MaxLite. [D.E. 18, 19.]

In late October 2012, the Court scheduled oral argument on the proposed preliminary injunction for December 18, 2012. [D.E. 29.] But after extensive briefing and with less than one month before oral argument, counsel for defendants moved (unopposed) to withdraw from representation. [D.E. 43.] Counsel declared, "On or about November 20, 2012, Dennis Shia, on

his own behalf and as president of M&C Lighting Ltd., notified me that [the firm] was discharged from representing Defendants in this matter." (Sekel Decl. ¶ 2 [D.E. 43-1].)

In response to this unforeseen development, then-Magistrate Judge Shwartz ordered that Shia and a representative of M&C appear in-person on November 30, 2012, the same day as a previously scheduled Fed. R. Civ. P. 16 conference. [D.E. 44; *see also* D.E. 23.] They failed to do so. Allowing former counsel to withdraw, Judge Shwartz ordered that by December 13, 2012, M&C would have to obtain new counsel and that Shia would have to do the same or notify the Court that he intended to represent himself. And Judge Shwartz:

> FURTHER ORDERED if defendant M & C does not have new counsel enter an appearance on its behalf by December 13, 2012 at noon, and because the corporate defendant cannot proceed without counsel licensed to practice law before this Court, the plaintiff shall request at the December 18, 2012 hearing before Judge Hayden that its Answer and counterclaim be struck, its opposition to the motion for a preliminary injunction be struck, and that default be entered;
>
> IT IS FURTHER ORDERED that if defendant Shia does not have new counsel enter an appearance on its behalf or notify the Court that he intends to proceed pro se by December 13, 2012 at noon, the plaintiff shall request at the December 18, 2012 hearing before Judge Hayden that his Answer and counterclaim be struck, his opposition to the motion for a preliminary injunction be struck, and that default be entered[.]

[D.E. 47.]

Defendants did not comply with Judge Shwartz's instructions or appear at the December 18 oral argument. (*See* Minutes [D.E. 50].) Thus, on January 7, 2013, the Court granted MaxLite its preliminary injunction and ordered the Clerk of the Court to enter default against defendants. [D.E. 52.]

C) <u>Motion to Set Aside Default</u>

Defendants remained unheard from until April 9, 2013, when newly retained counsel filed an appearance on the docket. [D.E. 56.] Defendants then filed the instant motion to set aside the default, pursuant to Fed. R. Civ. P. 55(c). [D.E. 57.]

In his declaration in support of setting aside the default, defendant Shia represents that, prior to the present lawsuit, neither he nor companies he worked for had ever been "parties to litigation in the United States." (Shia Decl. ¶ 3 [D.E. 57-1].) He contends that a combination of high legal bills and unfamiliarity with the American legal system led to defendants' withdrawal and inaction; moreover, he states that he could not retain replacement counsel on short notice because he did not know any other attorneys in the United States. However, by March 2013, he "felt that [he] ha[d] sufficient resources to hire new counsel." (Shia Decl. ¶¶ 4–9.)

Further, defendants argue that they have a meritorious defense to the present suit. They dispute MaxLite's characterization of the parties' vendor agreement, suggesting that the broad exclusivity envisioned by MaxLite does not accurately reflect the terms of the agreement. (Defs.' Moving Br. 5–6 [D.E. 57-2].) Further, they aver that the supposed "breach of confidentiality" was nothing of the sort, as the "confidential" information was "generic to the industry, such as commonplace designs and the identity of customers of lighting fixtures." (Defs.' Moving Br. 6.) Renewing their counterclaim, they emphasize that it was MaxLite, not M&C, that initially breached the agreement by "enabl[ing] a disloyal M&C employee to steal M&C's intellectual property and employees to set up a competing factory, Bright Light." (Defs.' Moving Br. 6.)

In response, MaxLite characterizes defendants' excuses as "attempts to play to the Court's sympathy by claiming that the Defendants are foreign persons unknowledgeable of the customs and costs of the United States and its legal systems." (Sheppeard Decl. ¶ 2 [D.E. 58.])[1] According to MaxLite, setting aside the default is not warranted because 1) defendants have failed to present a truly meritorious defense, 2) defendants engaged in "culpable conduct," and 3) defendants' activities have prejudiced MaxLite. (Pl.'s Resp. Br. 4–10 [D.E. 58-13].)

## II.     Jurisdiction and Standard of Review

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). MaxLite is a New Jersey corporation and defendants are all "citizens or subjects of a foreign state." Further, the amount in controversy exceeds $75,000.

The factors the Court must consider in determining whether to vacate entry of default are "(1) whether lifting the default would prejudice the plaintiff; (2) whether the defendant has a *prima facie* meritorious defense; (3) whether the defaulting defendant's conduct is excusable or culpable; and (4) the effectiveness of alternative sanctions." *Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 73 (3d Cir. 1987). Judgment by default is disfavored in this Circuit; resolution of cases on the merits is preferred. *See, e.g.*, *Harad v. Aetna Casualty & Surety Co.*, 839 F.2d 979, 982 (3d Cir. 1988); *United States v. Pinsky*, No. 10-2280, 2011 WL 1326031, at *2 (D.N.J. Mar. 31, 2011) (Simandle, J.). Doubts are therefore to be resolved in favor of lifting the default and allowing the case to proceed. *See Wells v. Rockefeller*, 728 F.2d 209, 214 (3d Cir. 1984); *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194–95 (3d Cir. 1984). Ultimately,

---

[1] Defendants argue that the form of, substance of, and attachments to Sheppeard's declaration are improper. They ask that the declaration be stricken. (*See* Defs.' Reply Br. 8–11 [D.E. 59-2].) Because the Court would grant defendants' motion in any event, the Court need not reach this argument.

whether to set aside a default under Fed. R. Civ. P. 55(c) is committed to this Court's discretion. *Farnese v. Bagnasco*, 687 F.2d 761, 764 (3d Cir. 1982).

### III. Discussion

The Court turns first to whether defendants have set forth a meritorious defense—the threshold question in setting aside a default. *Cf. Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984); *see also World Entm't Inc. v. Brown*, 487 F. App'x 758, 761 (3d Cir. 2012) (suggesting that failure to establish a meritorious defense "weighs heavily against," but does not doom, "setting aside the default"). A meritorious defense is one alleged with sufficient specificity that would, if proven at trial, absolve defendants of liability. *See U.S. Currency*, 728 F.2d at 195. In making such a finding, the Court is not passing on the relative strength of the complaint or the defenses raised. *See SEC v. McNulty*, 137 F.3d 732, 740 (2d Cir. 1998); *United States v. A Single Story Double Wide Trailer*, 727 F. Supp. 149, 151 (D. Del. 1989) ("In order to meet the burden of showing the existence of a meritorious defense, the claimant need not conclusively prove his case.").

In their submissions in both the preliminary injunction proceeding and the present motion to vacate default, defendants have asserted, in a non-conclusory fashion through documentary evidence and legal arguments, that they did not breach the vendor agreement—the issue that forms the heart of the complaint—or engage in any of the other alleged common-law violations. For example, pointing to the terms of the vendor agreement, defendants previously urged that the agreement was unenforceable for lack of consideration (*see* Defs.' Prelim. Inj. Resp. Br. 9 [D.E. 20]); that they did not, as alleged, sell product to customers other than MaxLite in violation of the agreement's exclusive "MaxLite Project" provision (Defs.' Prelim. Inj. Resp. Br. 10–11); and

7

that they never solicited any current MaxLite employees (Defs.' Prelim. Inj. Resp. Br. 16). Defendants specifically incorporate these arguments into their motion to set aside the default. (*See* Defs.' Moving Br. 5.) Under the applicable legal standard, the Court finds that the defendants have set forth a meritorious defense.

The Court does not find that MaxLite will be prejudiced by vacatur. Prejudice can be found when the plaintiff's "ability to pursue the claim has been hindered or . . . relevant evidence has been lost." *Emcasco*, 834 F.2d at 74. Hitting on that point, MaxLite urges that prejudice will result from the fact that "[p]arties affiliated with the Defendants have admitted to deleting valuable evidence in this matter in order to conceal their actions with Defendants." (Pl.'s Resp. Br. 9.) As a practical matter, MaxLite fails to show the kind of prejudice that would weigh against lifting the default. The prejudice arising from any alleged spoliation would not be the result of lifting the entry of default; the catalyst appears to be MaxLite's discovery demands, which would have been made had default never been entered.

The third consideration, whether defendants' default was the result of their culpable conduct, weighs against vacating the default. "'[W]illfulness' or 'bad faith' on [the] part of the defendant leading to the entry of default suffices to show culpable conduct." *Brown*, 487 F. App'x at 761. Such conduct includes "acts intentionally designed to avoid compliance with court notices." *Hritz*, 732 F.2d at 1183. Here, defendants knowingly and intentionally avoided compliance with Court orders, which was the proximate cause of their default. Although they insist that their default is excusable because of their unfamiliarity with American legal market and because they had insufficient funds to pay their legal bills, defendants made no attempt to contact the Court from November 2012 through April 2013. It was, therefore, defendants'

8

willful non-compliance with Court orders that proximately caused the entry of default, and not merely excusable negligence.

This leads the Court to the final consideration: the effectiveness of alternative sanctions. "The alternative sanctions factor is motivated by the court's recognition that default is a harsh sanction and that lesser sanctions may adequately deter bad conduct while allowing cases to be decided on their merits." *Nat'l Specialty Ins. Co. v. Papa*, No. 11-2798, 2012 WL 868944, at *6 (D.N.J. Mar. 14, 2012) (Bumb, J.). Even though the Court concludes that defendants defaulted by virtue of their own willful conduct, it is not prepared to levy the harsh sanction of default judgment against them. Instead, the Court grants Maxlite's request that the preliminary injunction remain in place. (*See* Pl.'s Resp. Br. 10.)

## IV. Conclusion

For the foregoing reasons, the Clerk's entry of default is set aside, and the preliminary injunction entered January 7, 2013 shall remain in effect until further order of the Court. An appropriate order will be entered.

December 30, 2013 /s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.